Robert S. McNAMARA, Secretary of Defense, et al., Appellants,

v.

Joseph W. DICK et al., Appellees.

No. 17216.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 18, 1962.

Decided May 16, 1963.

Certiorari Denied Oct. 28, 1963.
See 84 S.Ct. 171.

Mr. Edward Berlin, Attorney, Department of Justice, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Acting Asst. Atty. Gen. Joseph D. Guilfoyle and Messrs. David C. Acheson, U. S. Atty., and Sherman L. Cohn, Attorney, Department of Justice, were on the brief, for appellants. Mr. Morton Hollander, Attorney, Department of Justice, also entered an appearance for appellants.

Mr. Donald M. Murtha, Washington, D. C., for appellees.

Mr. Warren E. Miller, Washington, D. C., filed a brief on behalf of The National Association of Government Employees, as amicus curiae, urging affirmance.

Messrs. Bertram G. Davis and John S. Mears, Washington, D. C., filed a brief on behalf of the American Legion, as amicus curiae, urging affirmance.

Mr. Elmer G. Neumann, Washington, D. C., filed a brief on behalf of American Federation of Government Employees, as amicus curiæ, urging affirmance.

Before WILBUR K. MILLER, FAHY and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This is a civil service case, presenting important issues concerning the interpretation to be given the "transfer of functions" provision of Section 12 of the Veterans Preference Act of 1944, 58 Stat. 390, 5 U.S.C. § 861 (1958). Plaintiffs-appellees, employees of the Department of the Navy rated and described as "Shop Analysts and Schedulers," brought suit in the United States District Court for the District of Columbia, alleging that certain action taken with respect to them violated their rights under that section. The District Court granted declaratory relief, and the Government has appealed.

### I.

The background of the case is this:

In 1950, the Bureau of Ships, Department of the Navy, set up a "Production Planning and Control" system for altering, repairing and maintaining naval vessels at each Navy Yard. Upon notification that a vessel was coming in for alterations or repair, those employees in the Planning Division of the Navy Yard having the rating of "Planner and Estimator" (P&E) drew up job orders for all the work to be done to the vessel in accordance with plans or design specifications, made estimates of cost, procured materials, and prepared planning schedules for the work.

The job orders then went to the Shop, or Production Department, of the Yard. There employees with the rating of "Shop Analyst and Scheduler" (A&S), whose duties were to serve as staff assistants to the Master Mechanic of the Yard, took the job order received from the Planning Division, broke it down in greater detail into the various job operations required, made their own cost estimates, scheduled the work by operations, kept an eye on its progress and on workloads, and in general established the controls over the Shop's production. The A&S position carried a lower rating and salary than the P&E position.

In 1959 the Navy Department began a reorganization—not yet completed—of the existing Production Planning and Control system. The reorganization was directed toward abolishing the duplication and repetition of effort, and cutting the costs and excessive paperwork, involved in the existing system. It abolished the A&S position, and assigned to the Planners and Estimators of the Planning Division the duty of putting the job order into the greater detail needed for scheduling work in the Production Department. A new position denominated "Shop Planner" was created in the Production Department to perform the shop planning duties which remained after the assignment to the P&E position of the duty of preparing detailed job orders. Employees with the A&S rating were given the opportunity to take an examination for the higher P&E rating, and those who passed the examination have been given the P&E

rating and salary. Others with former A&S ratings are being assigned to other jobs for which they are qualified, such as "Shop Planner."

The twelve plaintiffs-appellees are former A&S employees who did not pass the test for the P&E rating.[1] Being entitled to the rights given by the Veterans Preference Act, they appealed to the Civil Service Commission, limiting their claim by stipulation to the contention that a "transfer of function" to the Planning Division of each Navy Yard occurred when the A&S positions were abolished, within the meaning of Section 12 of the Veterans Preference Act, 58 Stat. 390, 5 U.S.C. § 861 (1958). That section provides in pertinent part:

"In any reduction in personnel in any civilian service of any Federal agency, competing employees shall be released in accordance with Civil Service Commission regulations which shall give due effect to tenure of employment, military preference, length of service, and efficiency ratings: *Provided* \* \* \* *And provided further,* That when any or all of the functions of any agency are transferred to, or when any agency is replaced by, some other agency, or agencies, all preference employees in the function or functions transferred or in the agency which is replaced by some other agency shall first be transferred to the replacing agency, or agencies, for employment in positions for which they are qualified, before such agency, or agencies, shall appoint additional employees from any other source for such positions."

Urging that a transfer of function had occurred, plaintiffs asserted before the Commission that they were entitled un-

der the Act to be transferred along with their job "function" to the P&E position, without test and with seniority rights. The Commission, for reasons we will later discuss, ruled adversely to them. This litigation followed.

## II.

Turning first to the text of Section 12 of the Veterans Preference Act of 1944, it is clear that Congress was primarily concerned with the problems caused by major government reorganizations. The section speaks of the situation arising "when any or all of the functions of any agency are transferred to, or when any agency is replaced by, some other agency, or agencies \* \* \*." This was a situation which had frequently arisen in the years just prior to 1944. Under the authority of the Reorganization Act of 1939,[2] the President had on numerous occasions abolished or curtailed the activities of a particular agency, transferring its duties to one or more other agencies—already existing or newly created—in the interest of increased efficiency and economy in governmental operations.[3] The Reorganization Act of 1939 provided, *inter alia,* in Section 4, 53 Stat. 562, for the "transfer of the whole or any part of any agency or the functions thereof to the jurisdiction and control of any other agency;" or "the abolition of the whole or any part of any agency" whose functions have been or will be "terminated" or transferred. The word "functions" was not expressly defined, but was evidently used in the sense of "authority, powers and duties" (see Section 8(b), 53 Stat. 563), when "expressly authorized by law" (see Section 3(f), 53 Stat. 562).[4]

The Reorganization Act of 1939, in Section 4(d)(2), 53 Stat. 562, required

1. They were among those reassigned and now hold other jobs with the Navy Department.

2. 53 Stat. 561–65, approved April 3, 1939. See also Act of June 30, 1932, 47 Stat. 413.

3. Reorganization plans promulgated under the Reorganization Act of 1939 are re-

produced in the notes to 5 U.S.C.A. § 133t (Cum.Supp.1950).

4. The cited sections provide:
   "Sec. 8. \* \* \*
   "(b) No suit, action, or other proceeding lawfully commenced by or against the head of any agency or other officer of the United States, in his official capacity or

the President to "make provision for the transfer or other disposition of the * * * personnel affected * * *" by a plan. In Section 10, 53 Stat. 563, a limited measure of job protection was given to the affected personnel.[5]

When the bill which became the Veterans Preference Act of 1944 was under consideration, veterans' groups asked for a greater measure of job protection in reorganizations. Mr. Flemming, Chairman of the Civil Service Commission, and Congressman Starnes, author of the bill, spoke as follows:

"Mr. Flemming: It [the bill] does not guarantee a job. It simply provides, if there is a transfer of that kind, that the agency to which the functions have been transferred cannot go out into the open labor market to recruit people until they

have placed all preference eligibles who are qualified for positions in that agency.

"Mr. Starnes: That is one principle the veterans' organizations have fought for most vigorously. Oftentimes they have found agencies which have transferred or abolished their functions entirely and a new agency was set up in its place. The new agency then would leave the veterans in the cold and go out into the open labor market and recruit new appointees. It is a device which the veterans claim have been used against them to eliminate them from Government appointments, by simply abolishing the function or transfer the function and leaving the personnel out in the cold. That is one practice of ignoring veterans' pref-

in relation to the discharge of his official duties, shall abate by reason of any *transfer of authority, power, and duties from one officer or agency of the Government to another* under the provisions of this title, but the court, on motion or supplemental petition filed at any time within twelve months after such transfer takes effect, showing a necessity for a survival of such suit, action, or other proceeding to obtain a settlement of the questions involved, may allow the same to be maintained by or against the head of the agency or other officer of the United States to whom the *authority, powers, and duties* are transferred." (Emphasis supplied.)
"Sec. 3. No reorganization plan under section 4 shall provide—
* * * * *
"(f) For authorizing any agency to exercise any function which is not expressly authorized by law."
For one example, among many, of the use of the word "functions" in reorganization plans, see Reorganization Plan No. III, 5 Fed.Reg. 2107, 54 Stat. 1231, which provided in part:
"CIVIL AERONAUTICS AUTHORITY
"Sec. 7. *Functions of the Administrator Transferred.*—The functions vested in the Civil Aeronautics Authority by the Civilian Pilot Training Act of 1939; the functions of aircraft registration and of safety regulation described in Titles V and VI of the Civil Aeronautics Act of 1938, except the functions of prescribing safety standards, rules, and regulations

and of suspending and revoking certificates after hearing; the function provided for by Section 1101 of the Civil Aeronautics Act of 1938; and the functions of appointing such officers and employees and of authorizing such expenditures and travel as may be necessary for the performance of all functions vested in the Administrator; are transferred from the Civil Aeronautics Authority to and shall be exercised by the Administrator, who shall hereafter be known as the Administrator of Civil Aeronautics."

5. Section 10 provided:
"Sec. 10. (a) Whenever the employment of any person is terminated by a reduction of personnel as a result of a reorganization effected under this title, such person shall thereafter be given preference, when qualified, whenever an appointment is made in the executive branch of the Government, but such preference shall not be effective for a period longer than twelve months from the date the employment of such person is so terminated.
"(b) Any transfer of personnel under this title shall be without change in classification or compensation, except that this requirement shall not operate after the end of the fiscal year during which the transfer is made to prevent the adjustment of classification or compensation to conform to the duties to which such transferred personnel may be assigned."

erence." (Hearings on H.R. 4115, 78th Cong., 2d Sess., before the Senate Committee on Civil Service, May 19, 1944, p. 10)

The congressional purpose was thus to protect veterans who were affected by transfers of functions from one agency to another, and the term "functions" was evidently to have the same meaning ("authority, powers, and duties") as under the Reorganization Act of 1939. Nothing in the statute or the legislative history refers to similar transfers within a single agency.[6] The regulation adopted by the Civil Service Commission in 1944 to implement Section 12 simply copied the statutory language, and spoke only of transfers between agencies. See Section 20.8 of the Regulations, 5 C.F.R. § 12.306 (1944 Supp.); 5 C.F.R. § 20.8 (1961). However, in 1954, the Commission decided that the statute and Section 20.8 of the Regulations also applied to transfers of functions within a single agency. Under date of January 12, 1954, it sent Departmental Circular No. 740 to the heads of all agencies, advising them of its conclusions. Later, on May 19, 1959, the General Counsel of the Commission rendered an opinion concerning the problems "brought about by the disestablishment of the Corpus Christi Naval Overhaul and Repair Facility," with special reference to the interpretation of Section 12 of the Veterans Preference Act. Finally, under date of June 23, 1960, the Commission issued Supplement No. 2 to Departmental Circular 740, further defining its position as to the application of Section 12.

The personnel actions complained of here took place on or about November 17, 1959. Appellees argue that only the regulations promulgated prior to that date, together with the statute, can be considered in determining the legality of the action taken. Assuming for present purposes (as did the Commission) that this is so, we note first that the statute and the 1944 regulation (Section 20.8) deal only with transfers of functions between agencies, and have no direct bearing on the present case—unless the word "agency" is given some meaning not apparent on the face of the statute. We come, then, to the 1954 Departmental Circular, in which for the first time the Commission ruled that Section 12 applied to transfers within an agency. It did this by construing "agency," as used in Section 12, as including "an entire independent establishment, a bureau, branch, division, section, or smaller organizational entity."[7] The Commission went on to say:

"The applicability of Section 20.8(a) depends upon a judgment as to whether, in conjunction with a reduction in force, a function or functions of one organizational entity can be identified as having been transferred to another organizational entity. If such is found to be the case, then the incumbent or incumbents of positions engaged in the transferred functions must be given the opportunity to follow the functions prior to any reduction-in-force action which might otherwise affect them."

No effort, however, was made to define or explain what was meant by the terms "function" or "functions."

### III.

We turn now to the administrative rulings made in the present case.

As we have noted, after the action of the Navy Department in abolishing the A&S position in 1959, appellees brought their case before the Civil Service Com-

---

6. It would, perhaps, have been surprising if the Act had attempted to deal with intra-agency transfers, since the prevailing philosophy appears to have been that agency functions should vest in the head of an agency, subject to being delegated by him to any chosen subordinate or agency division. See, for example, the quotation from Reorganization Plan No. III, supra note 4.

7. The Government offers no challenge to the power of the Commission to propound this broader rule, and for present purposes we assume the power existed.

mission. The Chief Appeals Examining Officer, after hearing, concluded on the evidence before him that there had not been a transfer of functions within the meaning of the statute and the regulations in force on November 17, 1959.[8] He also held against the employees on an alternative ground:

"Even if the contention of the attorney for the appellants is correct that some act of transfer was required, Section 20.8 of the Commission's regulations would require that the transfer of Shop Analysts and Schedulers be accomplished without change in tenure of appointment. In other words, they would have arrived in the Planning Division as Shop Analysts and Schedulers and in a reduction in force they would have no right to promotion to the positions of Planners and Estimators.

8. His opinion stated in pertinent part:
   "Neither the statute or regulations cited provide that a specific duty or task is a function per se. The word function is not defined in the law or the regulations and it seems to us that a function is more or something different from the duties or tasks that might be assigned to a particular position.
   *     *     *     *     *
   "In the instant case, we have a situation where the Planner and Estimator has been directed to make a more detailed job order than the one he made heretofore. This eliminates the necessity for the Shop Analyst and Scheduler to prepare the detailed job order.
   "Thus, we are brought to the question—was the preparation of this detailed job order the function of the Shop Analyst and Scheduler?
   "We think not. The Production Control Manual clearly describes the function of the Shop Analyst and Scheduler. He is, or was, the staff assistant to the Master Mechanic in the Shop.
   "It seems to us that if we were to find that such a function had been transferred we would have to find some person in the Planning Division who was now performing the function of staff assistant to the Master Mechanic. As we noted hereinbefore, the function of the staff assistant did not consist solely of preparing more detailed job orders.

"In short, the result would have been exactly the same as the present action if the Department of the Navy followed the method advocated by the attorney for the appellants; a reduction in force among Shop Analysts and Schedulers."

Appeal was then taken to the Board of Appeals and Review. However, the Civil Service Commission decided to review the case itself. It held adversely to the employees in a final decision rendered on December 7, 1960.

█ The Civil Service Commission took the view that "in reality the primary work of the Planners and Estimators and the primary work of the Shop Analysts and Schedulers were, prior to the reorganization, operating parts of a single function and not independent and separable functions." Thus, it said, "no transfer of function occurred * * *."[9]

"Thus, we find no transfer of functions has occurred * * *."

9. To quote the Commission:
   "As to the facts, the Commission finds from the evidence of record that the function, the identity of which is the prime issue in this appeal was, and still is, the maintenance of planning and production control in each Naval Shipyard. The Commission further finds that, whereas prior to the reorganization, the planning and production control function operated with the Planners and Estimators furnishing broad outlines of the repair and maintenance work to be performed at the Shipyards, with the Shop Analysts and Schedulers following through with more detailed instructions on the same work orders the function has, since the reorganization, been so rearranged that the preparation of the detailed instructions formerly supplied by the Shop Analysts and Schedulers has been assigned to Planners and Estimators. The evidence also discloses that the Planners and Estimators have, prior to and since the formal inception of the production control system, performed work the substance of which has been preliminary to and related to the work performed by the Shop Analysts and Schedulers, all of which work was and is identified with the planning and production control function in each Naval Shipyard. In reality the primary work

We think these conclusions of the Commission are solidly based in the evidence, are consistent with the applicable law and regulations, and are in accord with the interpretation and understanding of the term "function" under the Reorganization Act of 1939. The Analysts and Schedulers were individual workers, assigned as staff assistants to the Master Mechanic of the Yard. They were not an "organizational entity" within the Commission's definition of the statutory term "agency," as used in its 1954 regulation (Section 20.8). Nor did the Planners and Estimators constitute such an entity. The transfer which occurred was not the transfer of the functions of an "agency," as defined by the Commission, but the transfer of certain job duties of individual workers, or, perhaps more correctly, of a class or grade of individual workers, to workers of another class or grade.[10]

Though the Commission did not refer to or discuss the alternate ground of decision relied on by the Chief Appeals Examining Officer, we think that ground has considerable merit. The P&E rat-

ing was higher than the A&S rating. In a reduction in force, persons in each grade or rating compete with others in that grade: the process does not permit persons in lower grades to compete at a higher level and thus gain a promotion. A transfer followed by a reduction in force, as desired by the appellees, would thus appear to gain them little or nothing. Cf. Powell v. Brannan, 91 U.S. App.D.C. 16, 196 F.2d 871 (1952); Cutting v. Higley, 98 U.S.App.D.C. 288, 235 F.2d 515, cert. denied, 352 U.S. 883, 77 S.Ct. 99, 1 L.Ed.2d 81 (1956). The Navy Department, as we have noted, has provided an opportunity to appellees to qualify for the higher P&E rating, by examination. It has also offered other jobs to appellees. We do not think that the law required it to do more.

For these reasons, the cause will be remanded to the District Court with directions that the judgment for the appellees be vacated and the motion of appellants for summary judgment be granted.

So ordered.

of the Planners and Estimators and the primary work of the Shop Analysts and Schedulers were, prior to the reorganization, operating parts of a single function and not independent and separable functions. As a result of the reorganization the operating parts of the Shipyards' planning and production control system were streamlined to eliminate one of the parts that was found to be superfluous, i. e. the Shop Analyst and Scheduler rating. In view of the above findings of fact, the Commission agrees with and affirms the conclusion of the Appeals Examining Office that no transfer of function occurred in the various Shipyards as a result of the reorganization so as to entitle the Shop Analysts and Schedulers to move into the Planning Departments where the Planner and Estimator positions were located before a reduction in force could ensue."

10. Appellees rely on a passage in the 1954 regulation, to the following effect:
   "The rights of the employees involved can be illustrated as follows:
   "Example A: All the functions of Section X in Division Y in a Federal Department are being transferred to Division Z in the same Department. Divi-

sion Y and Division Z are both in the same commuting area. Section X is composed of 100 employees, but after the transfer of functions there will be fifty surplus positions in Division Z.
   "*Step 1*—Any employees in Section X who will otherwise be involuntarily separated or demoted must be offered the opportunity to follow the functions. Employees who do not accept may be separated under Part 9 or Part 22 of the Commission's Regulations.
   "*Step 2*—A reduction in force situation exists in Division Z and the Retention Preference Regulations relating to reduction in force must be applied. Employees reached for separation or demotion have reassignment and retreat rights as employees of Division Z. Separated career employees are placed on the re-employment priority list and receive full benefits of the program for separated career employees (displacement, priority referral, and priority certification)."

Appellees' reliance on this example seems misplaced. "All the functions" of a section were not transferred in the present case: some of the duties of particular workers no doubt were.