Wylene J. NEBBLETT, Petitioner,

v.

OFFICE OF PERSONNEL MANAGEMENT, Respondent.

No. 00–3069.

United States Court of Appeals, Federal Circuit.

Jan. 30, 2001.

J. Christopher Shore, White & Case, of New York, NY, argued for petitioner.

Bryant S. Banes, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With him on the brief were David M. Cohen, Director; and Kathryn A. Bleecker, Assistant Director. Of counsel on the brief was Earl A. Sanders, Attorney, Office of the General Counsel, Office of Personnel Management, of Washington, DC.

Before PAULINE NEWMAN, CLEVENGER, and SCHALL, Circuit Judges.

CLEVENGER, Circuit Judge.

Wylene J. Nebblett seeks review of the final decision of the Merit Systems Protection Board ("Board") affirming a reconsideration decision of the Office of Personnel Management. *Nebblett v. Office of Pers. Mgmt.*, 83 M.S.P.R. 524 (1999). The reconsideration decision denied Ms. Nebblett's application for an immediate retirement annuity under 5 U.S.C. § 8336(d)(1) (1994). We affirm.

I

On December 23, 1983, Ms. Nebblett executed a signed written Request for Personnel Action, pursuant to which she resigned, effective December 31, 1983, from her position of Secretary in the office of the United States Attorney in Newark, New Jersey. The stated reason for her resignation was "Vertigo; stress." The documentary evidence of her resignation makes no reference to intolerable or adverse working conditions that may have contributed to her condition, or encouraged her resignation; instead, her resignation appears on its face to be wholly voluntary. The form that Ms. Nebblett executed expressly stated that "[y]ou are requested to furnish a specific reason for your resignation ... failure to provide it may result in your not receiving ... pay or other compensation due you." At the time of her departure from work, she was 50 years old and had completed approximately 30 years of federal service.

Entitlement of federal employees to immediate retirement annuities is governed by the terms of 5 U.S.C. § 8336 (1994). As of December 31, 1983, Ms. Nebblett did not qualify for an immediate retirement annuity under subsection (a) of section 8336. That subsection has an age requirement of 55 years, coupled with a requirement of 30 years of service. Nor could Ms. Nebblett qualify for an immediate retirement annuity under subsection (b), which requires 60 years of age and 20 years of service. At the time of her resignation, subsection (c) pertained to law en-

forcement officers and firefighters, positions not occupied by Ms. Nebblett. Other subsections of section 8336 also deal with job definitions and other requirements that Ms. Nebblett unquestionably does not meet.

Subsection (d) of section 8336, however, is a source of authority pursuant to which Ms. Nebblett arguably has a claim to an immediate retirement annuity. That provision reads, in relevant part, that:

(d) An employee who—

(1) is separated from the service involuntarily, except by removal for cause on charges of misconduct or delinquency; ... after completing 25 years of service or after becoming 50 years of age and completing 20 years of service is entitled to an annuity....

By its plain terms, this subsection would not appear to be of any comfort to Ms. Nebblett, because her resignation seemed on its face to be voluntary. This facial disparity between the law and the facts is dissipated, according to Ms. Nebblett, because, according to her allegations, her resignation was not voluntary at all. Instead, Ms. Nebblett asserts that her separation was coerced, that she was separated from her job against her will as a result of wrongful and intolerable working conditions. As a coerced retiree, Ms. Nebblett contends that she meets the definition of a "an employee who ... is separated from the service involuntarily." If this contention, which raises an issue of statutory interpretation, is correct, Ms. Nebblett would fulfill the qualifications for an immediate retirement annuity as of December 31, 1983.

## II

Ms. Nebblett began her quest to obtain an immediate retirement annuity in 1988, approximately five years after she left her job in Newark. The application filed by Ms. Nebblett on November 7, 1988, made no reference to the reasons for her resignation other than her stated "Vertigo; stress." On February 24, 1989, OPM denied Ms. Nebblett's application, and in-

formed her that upon reaching 62 years of age, she could reapply for an annuity. Ms. Nebblett sought reconsideration of that decision, and OPM responded in writing on May 24, 1989. OPM's decision recited the statutory tests of section 8336 for an immediate retirement annuity, and in each case concluded that Ms. Nebblett's facts did not meet the statutory tests. Of particular relevance, OPM stated that she had not been involuntarily separated from service and thus could not qualify for an annuity under subsection (d). OPM notified Ms. Nebblett that she might pursue disability retirement benefits under 5 U.S.C. § 8337 (1994), or, upon reaching 62 years of age, pursue a deferred retirement annuity under 5 U.S.C. § 8338(a) (1994).

Ms. Nebblett petitioned the Board for review of the unfavorable reconsideration decision by OPM. Her petition was dismissed for untimeliness. Ms. Nebblett next returned to OPM, on August 2, 1990, with the assistance of counsel, filing a fresh application for an immediate retirement annuity. By separate letter to OPM, Ms. Nebblett's counsel asserted that she is entitled to an immediate retirement annuity, because her resignation was involuntary, having been coerced. According to counsel, Ms. Nebblett had been constructively discharged, against her will. Ms. Nebblett thus alleged to OPM, for the first time, that she is the victim of an unlawful adverse personnel action.

For reasons that are unclear from the record before us, OPM did not finally respond to Ms. Nebblett's 1990 application until December 5, 1995. In its written rejection of her application, OPM reasoned that "even if your resignation was coerced, resignations, in any form are not generally deemed involuntary separations." OPM further reasoned that Ms. Nebblett's 1983 Request for Personnel Action afforded her the opportunity to "furnish a specific reason for your resignation," and explained that failure to furnish such information could result in losing entitlement to "pay or other compensation due you." In addi-

tion, OPM stated that since her personnel file showed what could only be considered a voluntary resignation, and since OPM relies on the "agency certifying official's determination of an employee's separation," OPM felt obligated to conclude that Ms. Nebblett did not qualify for an immediate retirement annuity as a person who had been involuntarily separated from service.

Ms. Nebblett returned to the Board, seeking review of the final decision by OPM. Once underway at the Board, however, OPM rescinded its 1995 final decision, thus depriving the Board of jurisdiction to hear Ms. Nebblett's appeal. On review in this court, we confirmed OPM's authority to rescind its reconsideration decisions, and held that if OPM did not act within 30 days to reinstate a reconsideration order, Ms. Nebblett could treat its silence as an implicit negative reconsideration order, and reinitiate proceedings at the Board. *See Nebblett v. Office of Pers. Mgmt.*, 152 F.3d 948 (Fed.Cir.1998) (table).

Within 30 days, OPM issued a reconsideration order, denying Ms. Nebblett's application, on the ground that the newly asserted theory of an involuntary separation is barred by the doctrine of administrative *res judicata*. Ms. Nebblett then returned, once again, to the Board seeking review of the May 7, 1998, OPM reconsideration decision. An administrative judge of the Board agreed with the agency that Ms. Nebblett's appeal is barred by the preclusive effects of her much earlier appeal to the Board. On petition for review, however, the full Board elected to hear Ms. Nebblett's challenge to the 1998 reconsideration decision.

The full Board framed the issue before it as whether, assuming Ms. Nebblett had been constructively discharged, she could be deemed to have been "involuntarily separated, as that term is meant in 5 U.S.C. § 8336(d)(1)." The Board referred to the Federal Personnel Manual ("FPM"), which was in effect when Ms. Nebblett left her job, which defined "involuntary separation" to include reductions in force, expira-

tion of an incumbent's term of office, and other actions, all of which are proper and legal acts taken by an agency that result in an employee's involuntary separation. Citing *Allen v. Office of Pers. Mgmt.*, 77 M.S.P.R. 212, 216 (1998), and *Sanderson v. Office of Pers. Mgmt.*, 72 M.S.P.R. 311, 315 (1996), *aff'd*, 129 F.3d 134 (Fed.Cir.1997) (table), *cert. denied*, 522 U.S. 1115, 118 S.Ct. 1051, 140 L.Ed.2d 114 (1998), the Board concluded that resignation coerced by intolerable working conditions is not an involuntary separation for purposes of section 8336(d)(1). Its conclusion followed long-standing Board precedent that distinguishes constructive discharges (as unlawful adverse personnel actions) from involuntary resignations for purposes of section 8336(d) and holds that the latter must be of the lawful character of the examples cited in the FPM.

Ms. Nebblett timely sought review of the Board's decision in this court. We have jurisdiction under 28 U.S.C. § 1295(a)(9) (1994).

### III

■ We may only disturb a final decision of the Board if we determine that it is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. 5 U.S.C. § 7703(c)(1) (1994). For purposes of this appeal, we have before us a question of statutory interpretation. The issue is, as framed by the Board, whether a coerced resignation is to be treated as an involuntary separation for purposes of section 8336(d)(1). We have not squarely faced this question in our earlier cases.

■ Statutory interpretation of course is a question of law, which we may review without deference to the Board. We have, however, recognized that an agency's interpretation of its own statutes is entitled to careful respect from this court, and, when we are presented with a statutory ambiguity, the *Chevron* doctrine commands our endorsement of the agency's interpretation, provided that we can fairly conclude that the agency's interpretation is reasonable under the circum-

stances. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

■ We begin with the words in the statute that are in issue: "an employee who ... is separated from the service involuntarily." 5 U.S.C. § 8336(d)(1). We also note that both parties agree with the correct assertion that the statute itself does not define the term "separated ... involuntarily." In Ms. Nebblett's instance, she was separated from the service as a result of her voluntary filing of her Request for Personnel Action in 1983. Although she may have felt compelled to file the request because of intolerable working conditions, she in fact took the voluntary act of resignation. From the agency's perspective, in 1983, without notice of an alleged constructive removal, Ms. Nebblett's separation could only be viewed as voluntary. Nonetheless, Ms. Nebblett's view of the matter is that her Request for Personnel Action was not voluntary, indeed it was forced upon her as her only choice to avoid continued exposure to a work situation wrongly made intolerable. The difference of opinion between the agency and Ms. Nebblett as to whether her resignation is voluntary or involuntary is a matter that cannot be decided as of the date of the specific personnel action of resignation. The truth of the matter could only be decided after a legal proceeding in which it would be determined whether coercion caused the resignation. The statute, however, does not speak of a determination that is to be made after a legal proceeding. The statute asks simply whether a separation is involuntary; if it is, then an immediate annuity is forthcoming, assuming the other requirements of section 8336(d)(1) are met.

The parties have not pointed us to any legislative history of the key statute that would indicate whether coerced separations underlying facially voluntary resignations should be deemed to be involuntary separations under section 8336(d)(1). Nor have we found any such history ourselves.

Under these circumstances, we find that it is fair to conclude that Congress did not focus, in enacting section 8336(d)(1), on whether a coerced resignation should be treated as an involuntary separation under the statute. Thus, we must consider the interpretation advanced by the agency, and test that interpretation, in the light of Ms. Nebblett's response, for its reasonableness.

## IV

According to the agency, the rights of an employee seeking an immediate retirement annuity under section 8336(d)(1) are entirely different from the rights of an employee who asserts that a facially voluntary resignation is actually a constructive removal, for which benefits must be awarded. Section 8336 resides in Chapter 83 of Title 5 of the United States Code, entitled "Retirement," and the section does not concern itself with the motives of an agency that may or may not have prompted an employee to retire. Constructive removals, on the other hand, are treated under Chapter 75 of Title 5, entitled "Adverse Actions," with the remedy for a constructive removal being found in subchapter IX of Chapter 55 of Title 5, entitled "Severance Pay and Back Pay." The remedy typically employed to correct a constructive removal is reinstatement of the employee to the position vacated, with back pay and benefits for the period from the constructive removal to the return to work. Under that remedy, the employee is treated as a matter of law as never having resigned. To emphasize this point, the agency notes that if Ms. Nebblett were to succeed with her allegation of a coerced resignation, then she would be reinstated with back pay and benefits and her personnel record would reflect that she had been consistently employed since the date of her resignation in 1983. She would be deemed never to have resigned, and thus would not have been separated in any fashion, for purposes of qualification under section 8336(d)(1).

Both Ms. Nebblett and the agency point us to the Federal Personnel Manual, Supp.

831–1, subch. S11–2(a) (Sept. 21, 1981), which was in effect at the time of Ms. Nebblett's departure from federal service in 1983. Examples cited therein of involuntary separation that qualify for recognition under section 8336(d) are: reduction in force, abolishment of position, lack of funds, expiration of incumbent's term of office, liquidation of an office or of an entire agency, and separation during probation for failure to qualify. Each of these examples has in common the fact that the agency action producing the separation is entirely legal. Nothing is wrong with those actions, and an employee has no rights to complain about the effects of those actions. We note that although the FPM is now abolished, the handbooks for the Payroll and Personnel Office under the Civil Service Retirement System ("CSRS") and the Federal Employees Retirement System ("FERS") contain a similar list of agency actions, all lawful in nature, that constitute involuntary separations. The former Federal Personnel Manual was superseded by the *CSRS and FERS Handbook for Personnel and Payroll Offices.* *See* FPM Sunset Document, OPM Document No. 157–53–8 at 103 (Dec. 31, 1993).

When an otherwise voluntary resignation is proven to be the result of coercion by the employing agency, the agency's conduct necessarily is determined to have been wrongful. This is so whether the action that prompted the otherwise voluntary resignation is misinformation or deception caused by the agency and upon which the employee relied, *see, e.g., Covington v. Department of Health & Human Servs.,* 750 F.2d 937, 942 (Fed.Cir.1984), a threat of disciplinary action that the agency knows is not sustainable, *see, e.g., Schultz v. United States Navy,* 810 F.2d 1133, 1136 (Fed.Cir.1987), or any other improper act by the agency, *see id.* at 1136. When an employee proves that intolerable working conditions have forced the employee to resign, it necessarily follows that those working conditions are unlawful, and in need of correction.

The agency further argues that it has consistently viewed involuntary separa-

tions under section 8336(d)(1) to require the common element of a lawful undertaking, a point that is firmly established in long-standing precedent of the Board. In this regard, the agency is correct: *Allen* and *Sanderson, supra,* are but examples of the Board's interpretation of "involuntary separation," for purposes of section 8336(d), to require lawful agency action that provoked a separation. The agency also reminds us that this court has previously looked to the examples in the FPM as guides to determine whether a separation is involuntary. *See Yarbrough v. Office of Pers. Mgmt.,* 770 F.2d 1056, 1058–59 (Fed.Cir.1985).

In addition to the argument that the remedies for coerced resignations and for retirement annuities when an employee is involuntarily removed are entirely different, the agency posits that OPM is not equipped to resolve the question of whether Ms. Nebblett's resignation was coerced by unlawful agency action. The agency points out that in order for Ms. Nebblett's view to prevail, OPM would be forced to conduct a hearing to determine if her resignation was indeed coerced. The defendant in those circumstances would be the agency that allegedly committed the wrongful coercion. As an adverse action under Chapter 75 before the Board, the agency would be defending itself in a typical fashion, with each side familiar with the discovery and litigating rules. But with the adverse action hearing being conducted in the first instance by OPM, to determine entitlement to the retirement annuity, OPM asserts that it has no authority and no regulations by which it could hale the agency into court to test the employee's assertions.

In sum, the agency asserts that the interpretation it gives to "involuntary separation" in the key statute—that such a separation must stem from a lawful agency act—is a reasonable one that commands our adoption.

V

Although Ms. Nebblett recognizes that the key statute does not itself provide a

definition of an "involuntary separation," she argues that her separation, if she were to prevail on her allegation of coercion, would constitute a resignation caused by the agency, against her will. Ms. Nebblett does not deny that she could have availed herself of the remedy afforded by Chapter 75, namely a challenge to her unlawful removal, which if successful would have entitled her to reinstatement with back pay. She also does not respond to the agency's argument that were she to succeed in proving that her resignation was unlawfully coerced, she would thereby prove that she had never been separated, and thus disqualify herself under section 8336(d)(1).

Ms. Nebblett rejects the agency's argument that OPM lacks the tools to decide whether her resignation was coerced, pointing to an express provision in Chapter 83 that empowers OPM to "perform ... such acts ... as are necessary and proper to carry out this subchapter." *See* 5 U.S.C. § 8347(a) (1994).

We agree with Ms. Nebblett that the agency cannot prevail solely on the ground that OPM may not have procedures in place that would permit it to efficiently resolve the factual question of whether Ms. Nebblett's resignation was coerced by working conditions so intolerable that no reasonable employee could be expected to endure those conditions. The agency has the power and means to provide an answer to that factual question.

A person in Ms. Nebblett's situation might argue that it is inhumane to force an employee who has been coerced into resignation by intolerable working conditions to vindicate her wrong by seeking reinstatement to the very agency that had wrongly pushed her out its door. While such an argument has a measure of appeal, it discounts the importance of proving, in a Chapter 75 proceeding, that the wrongful circumstances existed at the agency, the circumstances that caused the constructive removal. In order for the wrongful working condition to be corrected, it must first have been proven wrongful. A person who

succeeds in proving a constructive removal because of intolerable working circumstances provides the necessity for the agency to correct its wrong. A work environment so intolerable that no reasonable person can remain in it is an environment that must be changed, for the better. It is to the improved environment that the successful Chapter 75 litigant should be reinstated.

## VI

■ We are not persuaded by Ms. Nebblett's arguments that the agency's interpretation of the key statute is unreasonable. To the contrary, we find that the agency's interpretation is correct. The type of involuntary separation to which section 8336(d)(1) speaks is one that results from lawful agency action. Since agency action that allegedly caused Ms. Nebblett's resignation in 1983 necessarily must be deemed to be unlawful, she cannot meet the requirements for an immediate retirement annuity under section 8336(d)(1). We therefore affirm the final decision of the Board.

AFFIRMED.